**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ALEJANDRA NIETO, M.D.,<br><br>Plaintiff,<br><br>v.<br><br>PFIZER INC., *et al.*,<br><br>Defendants. | Civil Action No. 25-18265 (SDW) (LDW)<br><br>Civil Action No. 26-4159 (SDW) (LDW)<br><br>**AMENDED OPINION**<br><br>October 30, 2026 |

**WIGENTON**, District Judge.

Before this Court are Defendants Pfizer Inc., Douglas Lankler, Thomas J. Smith, Cecile Balagtas, Rod Junor, Rady Johnson, Edward Nowicki (collectively, "Pfizer Defendants"), Jackson Lewis P.C., Dana Glick Weisbrod, Kayla Lucia's (collectively, "Jackson Lewis Defendants") Motion to Dismiss *pro se* Plaintiff Alejandra E. Nieto, M.D.'s ("Plaintiff") First Amended Complaint in Civ. No. 25-18265 (D.E. 28 ("First Compl.)) and Defendants' Motion to Dismiss (D.E. 56) Plaintiff's Complaint in the Second Consolidated Action, Civ. No. 26-4159 (D.E. 1 ("Second Compl.)). Jurisdiction is proper pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction is proper under 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391. This Opinion is issued without oral argument pursuant to Rule 78. For the reasons set forth herein, Defendants' Motion to Dismiss the First Amended Complaint and Motion to Dismiss the Second Consolidated Action are both **GRANTED WITHOUT PREJUDICE**.

# I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

## A. Plaintiff's Background and Role at Pfizer

Plaintiff is a 52-year-old physician-scientist who worked for Pfizer Inc. ("Pfizer") for more than sixteen years, from approximately 2007 to 2024. (First Compl. ¶ 4; Second Compl. ¶ 11.) From 2014 to 2024, she held clinical and regulatory positions which required her to assess marketed pharmaceutical products for compliance with the U.S. Food and Drug Administration ("FDA"). (First Compl. ¶ 18.) In that capacity, Plaintiff's physician-scientist background assisted her role in identifying circumstances in which Pfizer's conduct could lead to misbranded products, false or misleading submissions to the FDA, or false claims submitted to federal healthcare programs. (*Id.* ¶¶ 19–20.)

## B. Pfizer's Non-Compliance and Plaintiff's Reporting

Beginning in 2014, Plaintiff raised written compliance concerns with her supervisors and Pfizer's Compliance team regarding FDA-regulated medications, specifically Protonix and Toviaz. (*See id.* ¶¶ 21–32.) In 2019, Plaintiff escalated her Protonix concerns, requested investigation and remediation, and warned that continued billing of Medicare and Medicaid for Protonix could expose Pfizer to liability under the False Claims Act. (*Id.* ¶ 26.) On May 21, 2019, Pfizer's legal team confirmed that an investigation had been completed and that its findings were confidential. (*Id.* ¶ 27.)

With respect to Toviaz, Plaintiff learned in 2021 that Pfizer's decisions concerning a pediatric formulation of the drug raised compliance concerns under the Pediatric Research Equity

[1] The facts alleged herein are drawn from the operative Complaints filed in both the First Action and the Second Consolidated Action, in addition to corresponding exhibits from Defendants' Motion to Dismiss. A court may consider a document attached to a defendant's motion to dismiss, so long as the document is authentic and the plaintiff's claims are premised on it. *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)).

Act ("PREA"). (*Id.* ¶ 31.) On October 29, 2021, Pfizer formally decided not to commercialize the pediatric formulation for financial reasons. (*Id.*) Although the FDA had approved the pediatric formulation, Pfizer did not intend to make it available to patients. (*Id.*) Accordingly, on that same day, Plaintiff again escalated her concerns, stating that Pfizer's PREA deferral representations to the FDA were not supported by a genuine intent to conduct pediatric studies, and that continued billing to federal programs could therefore be potentially fraudulent. (*Id.* ¶ 32.)

C. <u>Retaliation Following Plaintiff's Non-Compliance Concerns</u>

Despite providing a written anti-retaliation assurance, after Plaintiff's initial compliance escalations in 2014, Pfizer excluded her from key meetings and email distributions and removed her from the decision-making process. (*Id.* ¶ 42.) In 2019, after Plaintiff escalated her concerns regarding Protonix and Pfizer conducted an investigation, Pfizer implemented a restructuring that demoted Plaintiff from Global Clinical Lead to a lower-level clinician role. (*Id.* ¶ 43.) Plaintiff was then assigned to lead the Toviaz program, which Pfizer leadership knew had no commercial future because Pfizer did not intend to commercialize the drug's pediatric formulation. (*Id.* ¶ 44.)

Pfizer also began issuing negative performance reviews after Plaintiff's compliance escalations, notwithstanding her longstanding record of positive evaluations praising her leadership and clinical research accomplishments. (*Id.* ¶ 45.) While continuing to raise compliance, safety, and regulatory concerns, Plaintiff wrote directly to Pfizer Senior Corporate Counsel Robert Ennis on May 21, 2019, stating that the investigation had negatively affected her career and asking whether Pfizer planned to remediate that impact. (*Id.* 46.) Despite this notice, Pfizer took no remedial action. (*Id.*)

D. <u>Reduction in Force, Plaintiff's Termination, and the Release Agreement</u>

In November 2023, shortly after Plaintiff's role was transitioned to being fully in-person, Pfizer informed Plaintiff that her position was being eliminated as part of a Reduction-in-Force

("RIF"), asserting that she had been ranked lower than her peers. (*Id.* ¶¶ 49–50.) On December 15, 2023, Pfizer presented Plaintiff with a severance package and proposed agreement. (*Id.* ¶ 57; D.E. 28-2 at 47.) The package included a Release Agreement and a Schedule A disclosure as required under the Older Workers Benefits Protection Act ("OWBPA"), containing information about the individuals in the decisional unit affected by the RIF, including the ages and titles of those selected for termination and those retained. (First Compl. ¶ 56.)

The cover letter stated that Plaintiff's official termination date would be February 12, 2024, unless she secured other employment before that date or signed the Release Agreement earlier. (D.E. 28-2 at 47.) The letter further provided that Plaintiff had 60 days from receipt of the severance package to consider and review the Release Agreement, followed by a seven-day revocation period after execution, and that the Release Agreement would not become effective until the revocation period expired. (*Id.*) The letter also advised Plaintiff of her right to consult an attorney before signing and stated that she would receive substantial severance payments if she signed the Agreement and did not revoke it. (*Id.* at 47–48.)

Under the Release Agreement, Plaintiff would receive severance benefits including a severance payment of $363,976.90, paid in separate installments totaling 59 weeks of pay, as well as other benefits such as medical, dental, vision, and life insurance coverage. (*Id.* at 50.) In exchange, Plaintiff would release claims in accordance with Paragraph 4 of the Release Agreement. (*Id.* at 51–52.) In relevant part, the Agreement provided that Plaintiff would discharge Pfizer, its current and former employees, and its representatives from all claims, except that she could file charges with the Equal Employment Opportunity Commission ("EEOC"), while waiving any right to recover individual monetary damages in connection with such charges. (*Id.* at 52–23.) The Release Agreement further stated that Plaintiff's signature would confirm that she "fully

understand[s] all of its terms and conditions", that the agreement is "legally binding", and that by signing, she is "giving up certain rights", noting that she was given up to 60 days to consider the agreement and agreeing that any changes to the Release Agreement would not "restart the running of the 60-day consideration period." (*Id.* at 57.) Finally, the Release Agreement provided that Plaintiff did not waive any rights or claims arising after the agreement is signed. (*Id.* at 58.)

E. Plaintiff's Execution of the Release Agreement and the Revised Schedule A

On February 12, 2024, Plaintiff signed the Release Agreement. (First Compl. ¶ 55.) The following day, on February 13, Plaintiff wrote to Defendant Thomas J. Smith of Pfizer's Legal Division to raise concerns regarding potential retaliation and to request gender data from the Schedule A disclosure. (Second Compl. ¶ 16.) Plaintiff also forwarded those communications to Douglas Lankler, Pfizer's Chief Legal Officer, and Thomas R. Kelly, Pfizer's Vice President and Associate General Counsel, and Smith confirmed receipt the next day. (*Id.*; First Compl. ¶ 8.)

On February 17, 2024, Pfizer sent Plaintiff a revised version of the Schedule A. (First Compl. ¶ 58.) The revised Schedule A included OWBPA-required information for six additional individuals who had not been listed in the original Schedule A, did not change any information for the individuals identified in the original Schedule A, and added gender information for all eleven impacted employees, as Plaintiff had requested. (*Id.*; D.E. 28-2 at 64.) The revised Schedule A provided Plaintiff with a new, full 52-day period[2] (the standard 45-day review period plus a seven-

[2] This Court notes that in its letter transmitting the revised Schedule A, Pfizer described a single 52-day period without separately identifying a new 45-day consideration period and a seven-day revocation period. (D.E. 28-2 at 67.) That framing is disfavored because courts strictly construe the OWBPA's disclosure and procedural requirements, and the statute treats the consideration and revocation periods as separate and distinct. *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 381 (3d Cir. 2007); 29 U.S.C. § 626(f). However, because this was the second set of consideration and revocation periods Plaintiff received to review the Release Agreement and the Schedule A, and because Pfizer's letter referenced the prior seven-day revocation period triggered by Plaintiff's execution of the Release Agreement, this Court will not invalidate the Release Agreement on this basis alone.

day revocation period) to review the materials and exercise her right to revoke her signature on the Release Agreement, but only as to any potential federal age claims under the ADEA. (D.E. 28-2 at 67–68.)

The transmittal letter attached to the revised Schedule A stated that because Plaintiff had already signed the Release Agreement, Pfizer would begin severance payments upon expiration of the original seven-day revocation period, starting February 19, 2024. (*Id.* at 68.) Pfizer expressly reserved the right to stop severance payments and seek restitution if Plaintiff revoked her agreement to waive any potential age discrimination claims. (*Id.*) Plaintiff did not revoke her acceptance of the Release Agreement during the 52-day period, and Pfizer provided all severance benefits in accordance with the Release Agreement.

F. <u>EEOC Charge, NYSDHR Proceedings, and Subsequent Developments</u>

After receiving severance payments under the Release Agreement, Plaintiff filed a Charge of Discrimination ("Charge") with the EEOC and the New York State Division of Human Rights ("NYSDHR") on October 7, 2024, asserting Title VII and ADEA claims against Pfizer and seeking a Right to Sue Notice. (Second Compl. ¶ 18; D.E. 28-2 at 104–105.) Plaintiff filed the Charge more than 300 days after receiving notice of the RIF. On November 14, 2024, the EEOC issued Plaintiff a Notice of Right to Sue ("Notice"). (D.E. 28-2 at 108.) The Notice stated that Plaintiff had 90 days to file suit against the respondents named in the Charge, warned that the right to sue would be lost if suit was not filed within that period, and specified that the 90-day deadline applies to claims under the ADEA and Title VII. (*Id.*)

On January 19, 2025, Plaintiff filed a revised complaint with the NYSDHR, asserting violations of the New York State Human Rights Law against Pfizer. (*Id.* at 117–118.) On March 5, 2025, NYSDHR notified Jackson Lewis P.C., counsel for Pfizer, of the revised complaint. (*Id.*

at 110.) On April 18, 2025, Jackson Lewis submitted a Position Statement on Pfizer's behalf, contending that the revised Schedule A complies with the OWBPA and that the Release Agreement is enforceable, thereby barring Plaintiff's claims against Pfizer. (*Id.* at 74–79.)

G. Procedural History

On December 8, 2025, Plaintiff filed a nine-count Complaint in Civ. No. 25-18265 (the "First Action"). (D.E. 1.) While that case was pending, Plaintiff filed a second Charge of Discrimination with the EEOC and NYSDHR on January 7, 2026, asserting ADEA and Title VII claims and alleging that Pfizer retaliated by refusing to correct the allegedly defective Schedule A disclosure and by continuing to assert the validity of an invalid waiver to block Plaintiff's reemployment and oppose her claims. (First Compl. ¶ 67.) That charge remains pending and has not been resolved by either agency. (*Id.* ¶ 68.)

On February 11, 2026, Defendants moved to dismiss the initial Complaint for failure to state a claim. (D.E. 20.) On February 13, 2026, Plaintiff filed an Amended Complaint and Defendants again moved to dismiss; the motion was fully briefed. (D.E. 24, 28.) On April 17, 2026, Plaintiff filed a three-count Complaint (the "Second Consolidated Action") before this Court under Civ. No. 26-4159 against six of the ten Defendants named in the First Action. (D.E. 1.) On June 12, 2026, after obtaining leave, Defendants moved to consolidate the two matters, arguing that they were substantively similar, involved the same parties and theories of liability, and arose from the same events. (D.E. 49.) The Court granted consolidation on June 30, 2026, and briefing proceeded on Defendants' Motion to Dismiss the Second Consolidated Action. (D.E. 54, 56, 60, 63.) The issues are now ripe for adjudication.

## II. LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Determining whether allegations are plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

When deciding a motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief may be granted, federal courts "must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff," and determine "whether [the] plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichik*, 605 F.3d 223, 229 (3d Cir. 2010). If the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed for failing to show "that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "[L]abels and conclusions" or a "formulaic recitation of the elements of a cause of action" are insufficient to withstand a motion to dismiss. *Twombly*, 550 U.S. at 555.

## III. DISCUSSION

### A. The First Action

Plaintiff's Amended Complaint in the First Action asserts nine causes of action under the following federal and state statutes and under common law:

Count I: Retaliation Under the False Claims Act ("FCA") Against Pfizer, Inc.
Count II: Retaliation under the Age Discrimination in Employment Act ("ADEA") against the Pfizer Defendants
Count III: Disparate Impact Under the ADEA against Pfizer, Inc.
Count IV: Violation of the Older Workers Benefits Protection Act ("OWBPA") against Pfizer, Inc.

Count V: Retaliation Under Title VII of the Civil Rights Act ("Title VII") against Pfizer, Inc.
Count VI: Fraud and Misrepresentation against all Defendants
Count VII: Retaliation and Aiding and Abetting Under the New Jersey Law Against Discrimination ("NJLAD") against all Defendants
Count VIII: Declaratory Judgment against all Defendants
Count IX: Post-Separation Retaliatory Conduct against all Defendants

Defendants contend that with the exception of Count IX, which arose after Plaintiff executed the Release Agreement, all claims against the Pfizer Defendants are barred by the Release Agreement's broad release provisions. (D.E. 28-3 at 9–11.) Defendants further contend that Count IX should also be dismissed as to all Defendants under the litigation privilege. (*Id.*)

In the Second Consolidated Action, Plaintiff asserts the following three claims against Defendants Jackson Lewis, P.C., Dana Glick Weisbrod, Kayla Lucia, Douglas Lankler, and Edward Nowicki:

Count I: Retaliation based on protected activity under Title VII against all Defendants
Count II: Retaliation under the ADEA against all Defendants
Count III: Retaliation based on sex under Title VII against all Defendants

Defendants contend that all claims raised in the Second Consolidated Action are subsumed under Count IX in the First Action because they arise from Defendants' post-separation conduct in connection with the NYSDHR proceeding. (D.E. 56-1 at 6–7.) Given that two complaints and numerous claims are at issue, this Court addresses each in turn.

i. <u>Claims only against Pfizer Defendants (Counts I, II, III, IV and V)</u>

1. All claims must be dismissed against the Pfizer Defendants due to Plaintiff's signing of the Release Agreement.

The OWBPA is an amendment to the ADEA that imposes strict, mandatory requirements which must be satisfied for any waiver of ADEA rights to be deemed "knowing and voluntary." *Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1539 (3d Cir. 1997). The core purpose of the OWBPA's waiver provisions is to ensure that an older worker asked to sign an ADEA waiver does

so without fraud, duress, coercion, or mistake of material facts. *Long*, 105 F.3d at 1537 (quoting *Wamsley v. Champlin Ref. & Chemicals, Inc.*, 11 F.3d 534, 539 n.8 (5th Cir. 1993)).

In the context of a group termination program such as the RIF at issue, the OWBPA requires that an employee be afforded at least 45 days to consider the waiver and at least seven days to revoke it after execution. 29 U.S.C. § 626(F)(ii); *see Bailey v. Viacom Inc.*, 435 F. App'x 85, 92 (3d Cir. 2011). The consideration period begins to run from the employer's final offer, and a material change to the final offer restarts the 45-day clock unless the parties agree otherwise. 29 C.F.R. § 1625.22(e)(4). The Third Circuit strictly construes the OWBPA's disclosure requirements, and the employer seeking an ADEA waiver bears the burden of providing, in writing, the demographic information required by the statute. *Ruehl*, 500 F.3d at 381 (quoting *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 427 (1998).

Here, Paragraph 4 of the Release Agreement provides that Plaintiff releases any and all claims against Pfizer and its current and former employees. (D.E. 28-2 at 51–52.) Paragraph 6 provides that by signing, Plaintiff agrees not to file suit against Pfizer for any claims arising out of her employment or termination. (*Id.* at 52–53.) Under the Release Agreement, the only claims that Plaintiff may pursue are administrative charges with the EEOC or the NLRB. (*Id.*) Accordingly, the remaining question as to whether the Release Agreement bars Plaintiff's claims against the Pfizer Defendants is whether the Release Agreement is valid and enforceable as to Plaintiff.

Plaintiff contends that Pfizer committed three independent OWBPA violations, each of which she argues is sufficient to invalidate her waiver of ADEA rights: (1) the original Schedule A provided on December 15, 2023 was incomplete, and the revised Schedule A retained the original December 15 date in an effort to misrepresent the timeline of statutory compliance; (2)

Pfizer corrected the Schedule A only after Plaintiff signed the Release Agreement; and (3) Pfizer imposed an unauthorized, segmented "age-only" revocation structure along with a coercive threat to take back severance payments. (First Compl. ¶ 95.)

The parties do not dispute that Pfizer initially provided Plaintiff with 60 days to consider the Release Agreement—exceeding the OWBPA's 45-day minimum—along with the seven-day revocation period following execution. (D.E. 28-2 at 47.) Plaintiff signed the Release Agreement on February 12, 2024. (First Compl. ¶ 55.) Five days later, on February 17, 2024, Pfizer provided Plaintiff with a revised Schedule A identifying the individuals inadvertently omitted from the initial disclosure and supplying their required information. (*Id.* ¶ 58.) That transmittal expressly restarted the consideration and revocation periods, affording Plaintiff a new 52-day period from the date the revised Schedule A was sent—a 45-day consideration period plus a seven-day revocation period—consistent with the OWBPA. (*Id.* ¶ 59.)

Plaintiff does not allege that she revoked her signature under either revocation period, or at any time thereafter. As to Plaintiff's ADEA claims (Counts II and III), the Release Agreement became effective upon expiration of the renewed revocation period, and under its terms, Plaintiff was thereafter barred from asserting ADEA claims against any released parties. (D.E. 28-2 at 67–68.) The Release Agreement does not, however, bar Count IX, which is premised on alleged post-separation retaliatory conduct occurring after the Release Agreement's effective date.

At bottom, because the revised Schedule A restarted the OWBPA clock, there is no OWBPA violation and the Release Agreement signed by Plaintiff is valid. Although Plaintiff contends that the revised Schedule A did not restart the consideration period because the regulation addresses "material changes to the final offer" rather than corrections to defective statutory disclosures (First Compl. ¶ 95), courts treat changes to the Schedule A disclosure as material.

*Ruehl*, 500 F.3d at 381. Schedule A disclosure is a statutory prerequisite to a valid waiver, and revisions to that disclosure go to the core of what the employee is being asked to evaluate, and thus whether a waiver is knowing and voluntary. Accordingly, the Release Agreement bars all of Plaintiff's claims against the Pfizer Defendants.

2. Even if there was an OWBPA violation, Plaintiff's non-ADEA claims cannot proceed against the Pfizer Defendants.

The OWBPA's statutory provisions, including its waiver requirements, apply only to ADEA claims. *Wastak v. Lehigh Valley Health Network*, 342 F.3d 281, 295 (3d Cir. 2003); 28 U.S.C. § 626(f). Therefore, even if there was an OWBPA violation, it would only affect Plaintiff's ADEA claims. Courts in this District routinely enforce releases as to non-ADEA claims while separately analyzing the validity of the ADEA releases. *Recchia v. Kellogg Co.*, 951 F. Supp. 2d 676, 682 (D.N.J. 2013) (enforcing the release of claims under the ADA, ERISA, and NJLAD while separately analyzing the validity of the release of ADEA claims).

A waiver of claims against an employer is enforceable if it is executed voluntarily and knowingly. *Id.* In assessing whether a waiver is valid, courts apply a totality of the circumstances test, including: (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation of the release before signing it; (4) whether plaintiff knew or should have known her rights upon execution of the release before signing it; (5) whether plaintiff was encouraged to seek, or in fact received, benefit of counsel; (6) whether there was opportunity for negotiation of the terms of the agreement; (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled to by law. *Geraghty v. Ins. Servs. Off., Inc.*, 369 F. App'x 402, 405 (3d Cir. 2010) (quoting *Cirillo v. Arco Chem. Co., a Div. of Atl. Richfield Co.*, 862 F.2d 448, 451 (3d Cir. 1988)).

Here, the totality of the circumstances confirms that Plaintiff knowingly and voluntarily executed the Release Agreement. Plaintiff is a highly educated physician-scientist with substantial professional experience, including sixteen years at Pfizer. (First Compl. ¶ 4.) The language of the Release Agreement is also clear and unequivocal: it releases "any and all claims" and expressly encompasses claims arising under federal and state statutes and the common law—the sources of Plaintiff's claims. (D.E. 28-2 at 51.) Plaintiff also had ample time to consider her decision, including a 60-day consideration period and a seven-day revocation period, in addition to another 45-day consideration period and seven-day revocation period after Pfizer provided a revised Schedule A disclosure. (*Id.* at 47, 67–68.) The Agreement further advises Plaintiff to consult legal counsel. (*Id.* at 57.) Finally, Plaintiff received substantial consideration which she would not have already been entitled to—$363,976.90 in severance benefits, along with non-monetary consideration—expressly provided in exchange for releasing potential claims against the Pfizer Defendants. (*Id.* at 50.) On these facts, Plaintiff's waiver is enforceable.

Plaintiff contends that the alleged OWBPA defects render the entire Release Agreement involuntary—not just the ADEA waiver—because purported "incomplete disclosures, post-execution corrections, contradictory timeframes, and coercive clawback threats" show the Agreement was not executed knowingly and voluntarily as to any provision. (First Compl. ¶ 63.) The record does not support that characterization. Pfizer transmitted the revised Schedule A five days after Plaintiff signed and restarted the OWBPA review clock by providing a new 45-day consideration period and a seven-day revocation period. Plaintiff did not object during either period.

Plaintiff also suggests that the severance provisions operate as an improper "clawback". (*Id.*) While Plaintiff is correct that an employee need not tender back consideration to pursue an

ADEA claim where the OWBPA renders an ADEA waiver ineffective, that principle does not transform this Agreement into coercion as to the non-ADEA claims. *See Long*, 105 F.3d at 1536 (quoting *Oberg v. Allied Van Lines, Inc.*, 11 F.3d 679, 684 (7th Cir. 1993)). Here, the severance is framed as consideration for the release—not as a punitive reimbursement mechanism triggered by any minor breach. *Cf. Koenig v. Automatic Data Processing*, 156 F. App'x 461, 465 (3d Cir. 2005) ("[T]he stipulated damages clause enabled ADP to cease all of its obligations and seek reimbursement for any benefits provided after any breach, regardless of its severity, the Court concluded that it was an invalid penalty clause.").

Accordingly, even if Plaintiff's ADEA claims are not barred due to an OWBPA defect, her remaining statutory claims—statutory claims under the False Claims Act, Title VII, NJLAD, and the Declaratory Judgment Act, as well as common-law claims for fraud and misrepresentation and any alleged post-separation retaliatory conduct—remain barred by Plaintiff's knowing and voluntary execution of the Release Agreement.

3. Even if there was an OWBPA violation, Plaintiff's ADEA claims are time-barred.

Although an EEOC right-to-sue letter is not a prerequisite to filing an ADEA claim, when the EEOC issues such a notice, the plaintiff must file suit within 90 days. *Covington v. URS Corp.*, No. 11-04516, 2013 WL 2181282, at *2 (D.N.J. May 20, 2013) (citing *Seredinski v. Clifton Precision Prods. Co., Div., of Litton Sys.*, 776 F.2d 56, 63 (3d Cir. 1985)); 29 U.S.C. § 626(e). Courts treat this 90-day period like a statute of limitations. *Covington*, 2013 WL 2181282, at *2 (quoting *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 306 (3d Cir. 1983)).

Here, even assuming arguendo that the Release Agreement failed to comply with the OWBPA such that Plaintiff's ADEA claims are not waived, those claims are still time-barred. On November 14, 2024, the EEOC issued Plaintiff a Right to Sue Notice, expressly advising that she

had 90 days to file suit and that failure to do so would result in the loss of her right to sue Pfizer under the ADEA. (D.E. 28-2 at 108.) Plaintiff did not file this action until December 8, 2025—more than a year later and well beyond the 90-day deadline. (D.E. 1.) This delay is fatal to Plaintiff's ADEA claims, which must be dismissed.

ii. Claims against all Defendants (Counts VI, VII, VIII and IX)

Counts VI through IX are asserted against both the Pfizer Defendants and the Jackson Lewis Defendants. As explained above, most of those counts fail as a matter of law as to the Pfizer Defendants because the Release Agreement released all claims against them. As to the Jackson Lewis Defendants, Plaintiff alleges that Jackson Lewis and its attorneys—Dana Glick Weisbrod and Kayla Lucia—participated in drafting the Release Agreement and the Schedule A disclosure. (First Compl. ¶ 7.) Plaintiff further alleges that, acting as Pfizer's counsel, the Jackson Lewis Defendants falsely represented to the NYSDHR that the Release Agreement is valid and enforceable, and that they continued to maintain the release's validity even after Plaintiff submitted a revised filing to the NYSDHR. (*Id.* ¶ 6.)

1. All Claims Against the Jackson Lewis Defendants Must be Dismissed.

Plaintiff asserts four claims against the Jackson Lewis Defendants: fraud and misrepresentation (Count VI), retaliation and aiding and abetting under the NJLAD (Count VII), declaratory judgment (Count VIII), and post-separation retaliatory conduct (Count IX). All claims fail as a matter of law because they are barred by the litigation privilege.

In New Jersey, a statement made during judicial, administrative, or legislative proceedings is absolutely privileged and immune from civil liability. *Thomas v. Ford Motor Co.*, 137 F. Supp. 2d 575, 581 (D.N.J. 2001) (quoting *Hawkins v. Harris*, 661 A.2d 284, 287 (N.J. 1995)). The litigation privilege applies equally to litigants and attorneys and extends to "any communication

(1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; (4) that have some connection or logical relation to the action." *Id.* at 582. The privilege is construed broadly to promote honesty and allow participants to speak freely in the course of proceedings. *Koch v. Pechota*, 744 F. App'x 105, 114 (3d Cir. 2018) (quoting *Martirano v. Frost*, 255 N.E.2d 693, 695 (N.Y. 1969)).

Here, Plaintiff's allegations against the Jackson Lewis Defendants arise solely from their representation of Pfizer in the NYSDHR action[3]. Plaintiff alleges that Jackson Lewis represented Pfizer and made statements regarding the validity of the Separation Agreement and that attorneys Weisbrod and Lucia participated in preparing and defending Pfizer's OWBPA disclosures in that forum. (First Compl. ¶¶ 6–7.) The Jackson Lewis Defendants' defense of Pfizer falls squarely within the scope of litigation privilege, and all claims against them must be dismissed.

2. Claim for Fraud and Misrepresentation (Count VI) Must be Dismissed against All Defendants Because It Is Not Pleaded With Requisite Specificity.

Plaintiff's fraud and misrepresentation claim (Count VI) must be dismissed for the additional reason that it is not pleaded with the specificity that Rule 9(b) requires.

Fraud claims are subject to a "heightened pleading standard" and must be pleaded with particularity according to Rule 9(b). Fed. R. Civ. P. 9(b). To state a claim for fraud under New Jersey law, a plaintiff must allege: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable thereon by the other person; and (5) resulting damages." *Stone v. Prudential Fin., Inc.*, No. 21-14610, 2021 WL 5413989, at *2 (D.N.J. Nov. 19, 2021) (quoting

[3] Although Plaintiff's claims arise from an administrative proceeding before a New York State agency, New York and New Jersey apply substantively similar litigation privileges, so no choice-of-law issue is presented. *Koch*, 744 F. App'x at 114 ("New Jersey and New York's litigation privilege is absolute.")

*Citizens United Reciprocal Exch. v. Meer*, 321 F. Supp. 3d 479, 489 (D.N.J. 2018)). A negligent misrepresentation claim similarly requires a false statement of material fact, justifiable reliance, and resulting injury caused by that reliance. *Tijerina v. Volkswagen Grp. of Am., Inc.*, No. 21-18755, 2023 WL 6890996, at *35 (D.N.J. Oct. 19, 2023) (quoting *Bank of Am., N.A. v. Westheimer*, No. 12-7080, 2014 WL 809207, at *8 (D.N.J. Feb. 28, 2014)).

Here, the parties do not dispute that Pfizer provided Plaintiff with an incomplete Schedule A on December 15, 2023, and later sent a revised Schedule A on February 17, 2024. Plaintiff alleges the original Schedule A was fraudulent because Pfizer represented it as complete, accurate, and compliant with federal law, only to later acknowledge it was not. (First Compl. ¶ 102.) These allegations do not satisfy Rule 9(b). The pleadings do not clearly demonstrate how Plaintiff reasonably relied on the fraudulent statements to her detriment—particularly when Plaintiff simultaneously acknowledges that Pfizer later provided a revised Schedule A that cured the earlier deficiency and provided her additional time to consider the revised version. (*Id.* ¶ 104.) Moreover, Plaintiff has failed to plead how Defendants knew of the falsity of the original Schedule A, only alleging that Defendants "knew or should have known" that the disclosure was incomplete. (*Id.*) To the extent that Plaintiff's fraud theory rests on statements made in connection with or after the agency filings, those allegations are barred by the litigation privilege. Accordingly, Plaintiff fails to state a claim for fraudulent misrepresentation and Count VI must be dismissed against all Defendants.

iii. <u>Claims against Individual Pfizer Defendants (Counts II, VI[4], VII, VIII and IX)</u>

Even if any claims against the individual Pfizer Defendants could proceed, which this Court has already concluded they cannot, these claims must still be dismissed for independent

[4] *See supra.*

reasons. Individual Defendants Douglas Lankler, Rady Johnson, and Edward Nowicki are senior Pfizer executives, and Defendants Thomas Smith, Cecile Balagtas, and Rod Junor are current or former Pfizer employees whom Plaintiff alleges were involved in her termination and purported alleged OWBPA violation.

The ADEA does not impose individual liability—only an "employer" may be held liable. *Muhammad v. Sills Cummis & Gross P.C.*, 621 F. App'x 96, 98 (3d Cir. 2015) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 247 (3d Cir. 2006)); 29 U.S.C. § 623. Accordingly, Plaintiff's ADEA claim (Count II) against the individual Pfizer Defendants fails as a matter of law and must be dismissed.

Under the NJLAD, an individual may be liable only under an "aiding and abetting" theory. *Lopez v. Lopez*, 997 F. Supp. 2d 256, 276 (D.N.J. 2014) (citing *Cicchetti v. Morris Cnty. Sheriff's Off.*, 947 A.2d 626, 645 (N.J. 2008)). To demonstrate that an employee is liable as an aider or abettor, the plaintiff must show that: (1) the principal actor committed a wrongful act that caused injury; (2) the defendant was generally aware of their role in the overall wrongful conduct when providing assistance; (3) the defendant knowingly and substantially assisted in the principal violation. *Id.* To determine whether the defendant substantially assisted, courts consider the nature of the encouraged act, the amount of assistance provided, whether the defendant was present at the time of the alleged violation, the defendant's relationships with other participants, and the defendant's state of mind. *Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 127 n. 27 (3d Cir. 1999) (quoting Second Restatement of Torts § 876 (1979)).

Here, Plaintiff fails to state a viable NJLAD claim against any individual Pfizer Defendant. Plaintiff's theory of individual liability as to Lankler, Johnson, and Nowicki rests on their receipt of limited communications from Plaintiff and their high-level oversight roles within Pfizer. (First

Compl. ¶¶ 8, 12, 13.) The Complaint alleges only that Lankler oversaw legal and compliance structures, Johnson oversaw compliance programs, and Nowicki relied on allegedly defective OWBPA disclosures, and that they did not take "corrective action" even though they were aware of the alleged retaliation, discrimination, and OWBPA issues. (*Id.*) These allegations do not assert that any of them aided or abetted in any scheme, nor are they connected to any actionable misconduct.

This same analysis disposes of Count IX (post-separation retaliatory conduct). To state a Title VII post-separation retaliation claim, a plaintiff must plead, among other things, a causal connection between the protected activity and the adverse employment action. *Harris v. R.R. Constructors, Inc.*, 754 F. Supp. 2d 681, 687 (D.N.J. 2010) (citing *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008)). Plaintiff's theory against Lankler, Johnson, and Nowicki is that after Plaintiff's termination, they refused to correct the purported OWBPA defects and continued to assert the Release Agreement's validity despite Plaintiff's contention that it was defective. (*Id.* ¶¶ 117, 121.) These allegations again fail to link any of these individuals to actionable misconduct. The alleged post-separation conduct consists of maintaining a legal position about the Release Agreement, not of any actionable and intentional participation in retaliation by these individuals[5]. Accordingly, Count IX likewise fails as to Lankler, Johnson, and Nowicki.

The NJLAD claims against current and former Pfizer employees Smith, Balagtas, and Junor similarly fail. Plaintiff asserts that these Defendants retaliated by demoting her, excluding her from key responsibilities, issuing negative evaluations, selecting her for termination, and

---

[5] Pfizer Inc. is named in Count IX solely on a vicarious liability theory. Because the individual Pfizer Defendants are not liable under Count IX, Pfizer likewise must be dismissed from that claim.

attempting to enforce an invalid waiver. (*Id.* ¶ 110.) Plaintiff further alleges that they knowingly assisted, participated in, or failed to prevent the retaliatory conduct. (*Id.* ¶ 111.)

However, the Complaint only identifies that Balagtas directly supervised Plaintiff and participated in adverse employment decisions, Smith authored the revised Schedule A disclosure, and that Junor approved Plaintiff's selection for termination in the RIF. (*Id.* ¶¶ 9–11.) As with the executives, these allegations do not plead active and purposeful participation in any wrongful act. As a threshold matter, the Complaint does not plausibly allege a wrongful act at all. The NJLAD claims against Smith, Balagtas, and Junor therefore fail.

B. The Second Consolidated Action

While her first case was pending before this Court, Plaintiff commenced a separate action against Defendants Pfizer, Inc., Jackson Lewis P.C., Douglas Lankler, Edward Nowicki, Dana Glick Weisbrod, and Kayla Lucia, filing a three-count Complaint on April 17, 2026 (the "Second Consolidated Action"). On Defendants' motion, on June 30, 2026, Magistrate Judge Leda D. Wettre consolidated the Second Action with the First Action under the original docket number, Civ. No. 25-18265. (D.E. 54.) On July 16, 2026, Defendants moved to dismiss the Second Consolidated Action and requested that this Court consider the two Motions to Dismiss together. (D.E. 56.)

The Second Consolidated Action concerns alleged conduct occurring after Plaintiff's termination and asserts retaliation claims under Title VII based on protected activity and sex, and under the ADEA. (*See* Second Compl.) This action is premised on Defendants' post-separation conduct related to the NYSDHR proceedings, post-separation communications with Jackson Lewis attorneys, and Plaintiff's attempted communications with Pfizer executives. (*Id.* ¶¶ 19–32.)

i. Litigation Privilege Bars All Claims Against the Defendants

Litigation privilege bars Plaintiff's claims against all Defendants in the Second Consolidated Action. As discussed above, litigation privilege applies to litigants and their counsel and protects communications made in judicial or quasi-judicial proceedings that are intended to advance the objectives of the litigation and bear a logical relationship to the action. *Thomas*, 137 F. Supp. 2d at 582. Here, the Second Consolidated Action is largely premised on statements, positions, arguments, and communications by Jackson Lewis and its attorneys in connection with the NYSDHR proceeding, all of which are protected by the litigation privilege. (*See* Second Compl. ¶¶ 19–32.)

The only communications Plaintiff cites that are not directly tied to the NYSDHR proceedings are the November 22, 2024 and December 9, 2024 communications from former Jackson Lewis attorney Kayla Lucia, in which Lucia advised Plaintiff regarding her rights under the Release Agreement and explained that the 52-day review period applied only to Plaintiff's ADEA claims. (*Id.* ¶¶ 21–22.) Those communications are likewise privileged. The litigation privilege extends not only to communications made in an active proceeding, but also to "preliminary conversations" related to pending or contemplated litigation. *DeNicholas v. Centene Corp.*, No. 17-924, 2017 WL 7542616, at *2 (D.N.J. Oct. 20, 2017) (citing *Hawkins*, 661 A.2d at 289)). Lucia's November 22, 2024 and December 9, 2024 communications were made in connection with Plaintiff's anticipated litigation following her receipt of the EEOC Right-to-Sue Notice. Accordingly, any claims based on those communications are also barred by the litigation privilege.

ii. Even if litigation privilege did not apply, Plaintiff's claims against the individual Defendants must be dismissed as there is no basis for individual liability.

Even if this Court were to conclude that the claims in the Second Consolidated Action are not barred by the litigation privilege, the claims against the individual Defendants Nowicki, Lankler, Weisbrod, and Lucia, must still be dismissed because neither the ADEA nor Title VII provides for individual liability. *Muhammad*, 621 F. App'x at 98; *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1078 (3d Cir. 1996)). Moreover, Weisbrod and Lucia, as Pfizer's counsel, had no supervisory authority over Plaintiff and no employment relationship with her, providing another basis to dismiss the claims against them.

C. Leave to Amend

Although most of Plaintiff's claims appear to be barred by the Release Agreement and other legal doctrines, because dismissals under Rule 12(b)(6) are generally without prejudice, and in light of the less stringent pleading standards afforded to *pro se* litigants, both actions are dismissed without prejudice. *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

## IV. CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the First Amended Complaint in the First Action (Civ. No. 25-18265) and the Motion to Dismiss Plaintiff's Consolidated Second Action (Civ. No. 26-4159) are both **GRANTED WITHOUT PREJUDICE**. Plaintiff shall have thirty (30) days to file an Amended Complaint, and failure to do so may result in dismissal with prejudice. An appropriate order follows.

/s/ *Susan D. Wigenton*
**SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc: Parties
Leda D. Wettre, U.S.M.J.